SHAMUS S. FLYNN (SBN 14870)
Shamus@Flynngiudici.com
DANIEL R. GIUDICI (SBN 15228)
Daniel@Flynngiudici.com
ADAM M. JAFFE (Pro Hac Application Pending)
Adam@Flynngiudici.com
FLYNN GIUDICI, PLLC
3960 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone: (775) 406-9595
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

LUCKY LAKE FARM & WATER LIMITED PARTNERSHIP, a Saskatchewan Limited Partnership; and SWIFT RIVER FARMS LTD., an Alberta corporation;

Plaintiffs,

vs.

GORDON CLARK, an individual; RODNEY KOCH A/K/A GORDON CLARK, an individual; CINDY LOU ELLEN KOCH, an individual; KRYSTAL LEE CLARK, an individual; MICHAEL ROSE, an individual; MICHAEL ROSE & ASSOCIATES STRATEGIC CONSULTING INC., a Nova Scotia corporation; JEFF HOUGHTON, an individual; TW INTERNATIONAL INVESTMENTS LTD., a Bahamian Registered company; TW ADVISORS LTD., a British Virgin Islands registered company; TW FUNDS INC., a British Virgin Islands registered company; DOES I-XX, inclusive; and ROE CORPORATIONS, I-X, inclusive,

Defendants.

Case No.   2:23-cv-01768

## **COMPLAINT**

## **DEMAND FOR JURY TRIAL**

COMES NOW, Plaintiffs LUCKY LAKE FARM & WATER LIMITED PARTNERSHIP and SWIFT RIVER FARMS LTD. (together, Plaintiffs), by and through their counsel of record,

Flynn Giudici, PLLC, and hereby complain against Defendants GORDON CLARK; RODNEY KOCH A/K/A GORDON CLARK; CINDY LOU ELLEN KOCH; KRYSTAL LEE CLARK; MICHAEL ROSE; MICHAEL ROSE & ASSOCIATES STRATEGIC CONSULTING INC.; JEFF HOUGHTON; TW INTERNATIONAL INVESTMENTS LTD.; TW ADVISORS LTD.; and TW FUNDS INC. (collectively, Defendants) as follows:

## THE CONTROVERSY

1.    Plaintiffs, skilled in real property, project, and agricultural development, sought investment debt capital for one of their projects.

2.    When Plaintiffs were introduced to Defendants, Defendants marketed themselves as experienced investors, consultants, and principals in funds that provided project financing.

3.    Since their introduction, Defendants have engaged in a criminal scheme to defraud Plaintiffs through an advanced payment scheme.[1]  Defendants gained the trust of Plaintiffs by falsely using relationships with ubiquitous financial institutions and making false promises that Defendants would fund Plaintiffs' project.   However, Defendants' funding promise was contingent upon Plaintiffs' payment of an advance fee to Defendants.  Defendants never intended to fulfill their promises, collected the advance fee from Plaintiffs and have not returned Plaintiffs' monies.

4.    Defendants' scheme was complex, and their behavior was egregious. Defendants employed multiple fraudulent devices and operated outside the regulatory framework necessary for financial and securities transactions.   Further, Defendants made numerous false promises and representations to Plaintiffs as discussed more thoroughly herein.

5.    First, Defendants knowingly employed the impersonation of one of their majority shareholders/CEO (CEO) to allow the impersonator to commit fraudulent acts. As discussed below, the impersonator (one of the Defendants), was banned from the securities industry, and to avoid

---

[1] An advanced payment scheme, also known as an advance-fee fraud or advance payment scam, is a type of financial scam where fraudsters persuade victims to make upfront payments or provide advance fees in exchange for a promised benefit, service, or investment opportunity. In these schemes, the advance fee is required to purportedly cover various costs, such as processing fees, taxes, legal expenses or administrative charges. The victims are often told that once the payment is made, they will receive the promised benefit shortly afterward. However, after the victim makes the payment, the fraudsters either disappear without delivering the promised benefit or continue to invent reasons for delays, effectively stringing the victim along until the victim goes away.

detection by regulatory authorities, employed the impersonation of their CEO for a period of over thirty (30) months.[2]

6. Second, Defendants employed an insurance wrap fraud scheme.[3] Defendants claimed that payment of an advance fee was to be used to purchase insurance to secure Defendants' investment in Plaintiffs' project. Defendants misrepresented and misused the insurance wrap to lure Plaintiffs into a false sense of security. Moreover, Defendants, as Plaintiffs' fiduciary, received Plaintiffs' monies in trust and never purchased any insurance products as promised. Rather, Defendants used Plaintiffs' monies for their personal benefit, including purchasing in Nevada real property.

7. The scheme involved multiple companies and persons acting as "shills."[4] Defendants used and continue to use their sham companies as an attempt to layer and insulate their liability. First, the Defendants issued illusory contracts to Plaintiffs that conveniently omitted Defendants' verbal promises concerning the insurance wrap. Second, Defendants directed Plaintiffs to pay the shill entity and not the entity making the false promises to fund Plaintiffs' project. To no surprise, now that Plaintiffs have demanded the return of their monies, all Defendants have disavowed contractual liability for their fraudulent and unlawful conduct.

8. What is clear is that Defendants never intended to fund Plaintiffs' project or return Plaintiffs' monies. Since taking Plaintiffs' monies, Defendants have invented a series of false

---

[2] In 2023, Plaintiffs learned that the person claiming to be CLARK may in fact be KOCH. CLARK permitted KOCH and KOCH used CLARK's persona because KOCH was banned from the securities industry. KOCH received a 25-year suspension from the Alberta Securities Commission for fraud and egregious behavior related to swindling millions of dollars from investors. KOCH, a highly experienced fraudster throughout his securities career, could not use his real name in the financial markets to continue his unlawful behavior. As such, KOCH conspired with his son-in-law CLARK and other defendants to use CLARK's name.

[3] An "insurance wrap fraud scheme" typically involves a fraudulent ploy where insurance products are misrepresented or misused to lure victims. Insurance wrap fraud schemes exploit the trust people place in insurance products and use this trust to deceive victims.

[4] In a confidence scheme, the person who acts like a random third party but is actually part of the scheme is commonly referred to as a "shill." A shill is an accomplice who pretends to be an impartial bystander or customer to give the appearance of legitimacy to the scam. Shills are often used to create a false sense of trust or credibility, leading victims to believe that they are dealing with honest individuals or a reputable business. However, in reality, the shill is working in collaboration with the fraudsters to deceive and manipulate the victim.

excuses and delays with the anticipation that Plaintiffs disappear through a game of attrition. Because of Defendants' actions, Plaintiffs have sustained damages and are entitled to legal and immediate equitable remedies.

## **PARTIES**

9.      Plaintiff LUCKY LAKE FARM & WATER LIMITED PARTNERSHIP, (LUCKY LP) is a Saskatchewan Limited Partnership.

10.      Plaintiff SWIFT RIVER FARMS LTD. (SWIFT GP) is an Alberta Corporation acting as the General Partner of LUCKY LP.[5]

11.      Mark Langefeld (Langefeld) is the principal and authorized manager on behalf of Plaintiffs.

12.      Travis Stel (Stel) is an authorized business consultant on behalf of Plaintiffs.

13.      Upon information and belief, Defendant GORDON CLARK (CLARK) is an individual who was doing business in the State of Nevada and Canada and who resides in the State of Nevada.

14.      Upon information and belief, Defendant RODNEY KOCH[6] (KOCH) is an individual who was doing business in the State of Nevada and Canada and who resides in the State of Nevada.

15.      Upon information and belief, Defendant CINDY LOU ELLEN KOCH (CINDY) is an individual who was doing business in the State of Nevada and Canada and who resides in the State of Nevada.

16.      Upon information and belief, Defendant KRYSTAL LEE CLARK (KRYSTAL) is an individual who was doing business in the State of Nevada and Canada and who resides in the State of Nevada.

17.      Upon information and belief, Defendant MICHAEL ROSE (ROSE) is an individual who was doing business in the State of Nevada, the State of Florida, and Canada and resides in Florida and Canada.

---

[5] LUCKY LP and SWIFT GP may be referred to collectively as "Plaintiffs."
[6] Upon information and belief, KOCH is residing in the United States without legal status.

18.    Upon information and belief, Defendant MICHAEL ROSE & ASSOCIATES STRATEGIC CONSULTING INC. (MRA), is a corporation conducting business in Dartmouth, Nova Scotia.  Upon information and belief, Defendant ROSE is the owner of MRA.

19.    Upon information and belief, Defendant JEFF HOUGHTON (HOUGHTON) is an individual who does business in Edmonton, Canada, and resides in the State of Texas.

20.    Upon information and belief, Defendant TW INTERNATIONAL INVESTMENTS LTD. (TW INVESTMENTS), is a Bahamian registered company conducting business in Canada and the State of Nevada.

21.    Upon information and belief, Defendant TW ADVISORS LTD. (TW ADVISORS), is a British Virgin Islands registered company conducting business in Canada and the State of Nevada.

22.    Upon information and belief, Defendant TW FUNDS INC. (TW FUNDS), is a British Virgin Islands registered company conducting business in Canada and Clark County, Nevada.

23.    Upon information and belief, CLARK is the majority shareholder of TW INVESTMENTS, TW ADVISORS, and TW FUNDS (collectively, the TWI COMPANIES).

24.    Upon information and belief, KOCH is the father-in-law of CLARK, husband of CINDY, father of KRYSTAL, and a shareholder of TWI COMPANIES.

25.    Upon information and belief, CINDY is the wife of KOCH and a shareholder of TWI COMPANIES.

26.    Upon information and belief, KRYSTAL is the wife of CLARK, the daughter of KOCH, and a shareholder of TWI COMPANIES.

27.    Upon information and belief, ROSE is a shareholder of TWI COMPANIES.

**JURISDICTION AND VENUE**

28.    This Court has subject matter jurisdiction over this matter because this action is predicated on diversity of citizenship under 28 U.S.C. § 1332. The amount in controversy exceeds $75,000.00, exclusive of interest and costs.

29.     This Court has personal jurisdiction over this matter because certain Defendants reside in Nevada; and all of the Defendants maintain continuous and systematic contacts with Nevada, and specific acts underlying this controversy occurred in Nevada.

30.     Venue is proper because (i) certain of the Defendants reside, conspired, and operated a scheme to defraud Plaintiffs in Clark County, Nevada; and (ii) certain of the Defendants laundered the proceeds of their scheme to purchase real and personal property in Clark County, Nevada.

## **DEFENDANTS' FACTUAL BACKGROUND**

31.     Upon information and belief, since 2007, CLARK has resided and conducted business in Clark County, Nevada.

32.     On May 9, 2007, CLARK married KRYSTAL in Clark County, Nevada.

33.     KRYSTAL is the daughter of KOCH and CINDY, and KOCH is CLARK's father-law.

34.     Upon information and belief, in 2009, KOCH was investigated, charged, and ultimately suspended by the Alberta Securities Commission (ASC) for fraudulent and illicit activity. The findings and ruling of the ASC were adopted and enforced in the Provinces of British Columbia, Saskatchewan, Ontario, and Quebec.

35.     Specifically, on August 19, 2009, KOCH received a 25-year director-and-officer ban and was ordered to cease trading securities and was barred from using securities exemptions for 25-years (the ASC Bar) and was fined $225,000.00.  Millions of dollars were illegally raised from the sale of securities under the direction and control of KOCH.  Every investor witness that testified within the ASC proceedings stated that each had lost tens or hundreds of thousands of dollars and all had direct contact with KOCH.

36.     Upon information and belief, since before 2018, KOCH has resided in and has conducted business in Clark County, Nevada.

37.     Upon information and belief, and as a means to circumvent the ASC Bar and continue his unlawful behavior, KOCH enlisted his family members to set up a methodical process to bilk unknowing persons in the financial services market.

38.     Between 2014 and 2015, KOCH and CLARK created Defendants' shell companies, TWI COMPANIES, specifically: (i) TW ADVISORS in 2014; (ii) TW INVESTMENTS in 2015; and TW FUNDS in 2015.

39.     The TWI COMPANIES maintained elaborate websites advertising that the TWI COMPANIES are skilled and experienced investment advisors and principal operators in investment funds.[7]

40.     The TWI COMPANIES' websites did not and do not provide any information about their owners, principals, or any individual contact information.

41.     Upon information and belief, on December 15, 2014, CLARK became and remains the majority shareholder and authorized controlling principal of the TWI ADVISORS.

42.     Prior to September 2019, KOCH, CLARK, and the TWI COMPANIES each had a personal and professional relationship with ROSE, MRA, and HOUGHTON.

43.     Upon information and belief, ROSE knows that KOCH is subject to the ASC Bar.

44.     Upon information and belief, ROSE and MRA are partners with and facilitators for the TWI COMPANIES, CLARK, and KOCH.

45.     ROSE knows that the TWI COMPANIES are not a hedge fund or any sort of legitimate operating fund.  Rather, ROSE is fully aware that the TWI COMPANIES are sham companies that serve as both a front and an alter ego of CLARK, KOCH, and ROSE to operate Defendants' scheme.

46.     As part of Defendants' scheme, ROSE actively and solely promotes the TWI COMPANIES on the homepage of MRA's current website.[8]

47.     The TWI COMPANIES use MRA to layer their financial liability, and ROSE operates the MRA website as a fraudulent platform for the TWI COMPANIES, KOCH, CLARK, and ROSE to operate their nefarious activities.

**PLAINTIFFS' TRANSACTION**

---

[7] https://twinternationalinvestments.com/, https://tw-funds.com/. https://twenergyandtechnology.com/.
[8] https://michaelroseandassociates.com/.

48.    In early 2019, Plaintiffs were seeking an equity and debt investment product of approximately $150,000,000.00[9] for their real property and agricultural development project that proposed the acquisition and irrigation expansion of 15,000 acres of farmland (Farmland) in Saskatchewan, Canada (referred to throughout as the Project and the Transaction).  The purpose of the Project was for LUCKY LP to acquire the Farmland from SWIFT GP for $12,500,000.00 (plus an additional $5,300,000.00 for intellectual property related to the Project) and invest approximately $137,000,000.00 to develop the Farmland for agricultural production. SWIFT GP owned the Farmland, but the Farmland was encumbered with debt. LUCKY LP's acquisition would recapitalize the existing debt on the Farmland and provide working and development capital to monetize and develop the Farmland.

49.    In July 2019, prior to the Transaction, Christopher Boyle (Boyle), a financial advisor based in Edmonton, Canada, learned that HOUGHTON had completed multiple funding transactions with ROSE, CLARK, and the TWI COMPANIES.

50.    Boyle made direct contact with ROSE and CLARK in or about July 2019, on a telephone call, whereby both ROSE and CLARK participated together on the call.

51.    ROSE and CLARK explained MRA and the TWI COMPANIES' platform to Boyle and asserted that proposals for funding should be made via an online submission through MRA's website.

52.    ROSE and CLARK agreed that Boyle could communicate with HOUGHTON to confirm ROSE, CLARK, and the TWI COMPANIES' historical and successful transaction history with HOUGHTON.

53.    Subsequent to Boyle's telephone conversation with ROSE and CLARK, Boyle spoke with and personally met HOUGHTON in Edmonton, Canada.

54.    HOUGHTON stated to Boyle that HOUGHTON had closed "four (4) loans with TWI totaling $200,000,000.00."

55.    In September 2019, Boyle was engaged by Plaintiffs to procure the Transaction.

---

[9] All dollar amounts are Canadian currency unless otherwise indicated as USD.

Boyle introduced Stel and Langefeld, on behalf of Plaintiffs, to MRA and ROSE.

56.    In early September 2019, ROSE, acting as the shill in Defendants' scheme, had a telephone call with Langfeld and Stel, and represented himself and MRA as a strategic consulting firm based in Nova Scotia, Canada. As a means to circumvent regulatory oversight and securities compliance, ROSE represented that while MRA and ROSE were unlicensed financial brokers, MRA and ROSE offered project funding through private institutional investment partners.

57.    Plaintiffs explained their Transaction to ROSE.  ROSE was informed that purchase of the Farmland was essential to the Transaction.  Plaintiffs informed ROSE that SWIFT GP had debt obligations secured by the Farmland and that the initial funding for the Transaction would be used to retire the Farmland's debt.

58.    In September 2019, Plaintiffs had numerous additional telephone conversations with ROSE, wherein ROSE represented to Plaintiffs that MRA had multiple investors to consider the Transaction. ROSE made these false representations all the while knowing that ROSE, as the shill in Defendants' scheme, was intent on directing Plaintiffs only to the TWI COMPANIES, CLARK, and KOCH to make Plaintiffs a mark of Defendants' scheme.

59.    On September 20, 2019, Plaintiffs formally submitted the Transaction to ROSE for consideration.

60.    On September 23, 2019, ROSE, to continue Defendants' scheme, told Plaintiffs that ROSE had presented the Transaction to the TWI COMPANIES for consideration, and that the TWI COMPANIES confirmed a "strong interest in funding" the Transaction.

61.    On September 24, 2019, ROSE sent Plaintiffs a "Proposal Strategic Consulting/Hedge Fund Funding – Facilitation" (the MRA Engagement) on behalf of MRA to engage Plaintiffs for the facilitation of project funding with their "institutional investors."

62.    Under the terms of the MRA Engagement, Plaintiffs were obligated to pay MRA: (i) a $5,000.00 Evaluation Fee (the "Evaluation Fee"); and (ii) a two percent (2%) "Funding Consulting Underwriting/Placement Fee," which was calculated as two percent (2%) of successful funding received by Plaintiffs.  While MRA's success fee was labeled as a "Placement Fee" in the MRA

Engagement, moving forward and during the course of their scheme, ROSE and MRA invoiced and referred to this fee as the "Facilitation Fee." The first half of the Facilitation Fee was due upon "receipt of a letter of commitment and term sheet from an institutional investor." The second half of the Facilitation Fee was due upon Plaintiffs' receipt of transaction funds.

63.    The MRA Engagement also contained a "Letter of Interest'' from MRA (the MRA LOI). The terms of the MRA LOI specified that MRA would extend "strategic consulting services'' to Plaintiffs. To lull Plaintiffs into a false sense of security, MRA (prior to any formal submission or underwriting) had already identified the TWI COMPANIES as a sole candidate to invest in Plaintiffs' Transaction.

64.    Pursuant to their scheme and the terms of the MRA Engagement, ROSE and CLARK designed the MRA Engagement to immediately put into play a requirement that an advance fee was required before the receipt of any funds. Specifically, Section 3.2 of the MRA states "Based on above table half of the % is the placement fee which is due *after client has received letter of commitment and term sheet from institutional investor*…" (emphasis added). ROSE and CLARK already knew that CLARK and the TWI COMPANIES would deliver a sham term sheet and made it certain that no matter what deal Plaintiffs finalized, Plaintiffs would pay an advance fee whether to MRA and ROSE or the TWI COMPANIES and CLARK. No other fees were indicated in either the MRA Engagement or the MRA LOI.[10]

65.    Before proceeding with the MRA Engagement and making any payment to MRA or ROSE, Plaintiffs desired to verify MRA, ROSE, and the TWI COMPANIES' transaction capabilities.

66.    Plaintiffs, through Boyle, learned that HOUGHTON was a former and current client of the TWI COMPANIES and ROSE.

---

[10] Defendants' scheme involves the use of multiple illusory agreements, which identify multiple fees and interchangeable names for these fees. All of which are designed to purportedly obligate Plaintiffs to make an advance fee payment. Defendants' fraud is not only their misrepresentations and false promises that Plaintiffs' advance fee was to be used to purchase an insurance wrap, but Defendants' fraud is also that they intentionally omitted their insurance wrap lies from their agreements.

67.     When Plaintiffs questioned ROSE about HOUGHTON, ROSE promoted HOUGHTON as a successful investor and potential board member for Plaintiffs and that HOUGHTON had successfully executed capital transactions with the TWI COMPANIES. Plaintiffs also learned through ROSE, and independently through Boyle, that HOUGHTON had closed four (4) loans with the TWI COMPANIES totaling $200,000,000.00.

68.     Furthermore, ROSE recommended to Plaintiffs that they utilize HOUGHTON's consulting and advisory services as part of the Transaction to lend credibility and opportunity to Plaintiffs' post-Transaction business.

69.     As part of Defendants' scheme, ROSE also represented that if Plaintiffs signed with MRA, ROSE would not "shop Plaintiffs' deal" to any other investors, and ROSE would work exclusively with the TWI COMPANIES to invest in the Transaction, as the TWI COMPANIES, through the representations of ROSE, was interested in the Transaction.

70.     On October 22, 2019, Plaintiffs engaged MRA (Rose Engagement), and Plaintiffs wired MRA an Evaluation Fee of $5,000.

71.     Between October 22, 2019, and November 8, 2019, Plaintiffs had numerous e-mail and telephone communications with ROSE.

72.     At the direction of ROSE, and to make a false appearance that MRA, ROSE, and the TWI COMPANIES were capable and intending to fund the Transaction, ROSE advised Plaintiffs to revise the Transaction business plan multiple times.

73.     The bulk of Plaintiffs' time and internal communications centered around and were driven by ROSE's sham advice on what MRA would need to present to the TWI COMPANIES in order to have the TWI COMPANIES issue a term sheet to Plaintiffs.

**THE FRAUDULENT INSURANCE WRAP PRODUCT**

74.     To further their scheme, and to have Plaintiffs pay an advance fee to the Defendants, ROSE introduced the necessity for the purchase of an insurance policy (the Insurance Wrap) to successfully complete the Transaction.

75.     On November 1, 2019, Stel and Boyle had a telephone conversation with ROSE (the

Insurance Wrap Call). During this call, ROSE stated that a condition of the TWI COMPANIES' funding was Plaintiffs' obligation to make an advanced payment for the purchase of an Insurance Wrap. The cost of the Insurance Wrap was equal to one percent (1%) of the funding request ($1,760,000.00).

76.      Purportedly, the Insurance Wrap was necessary because (i) of "capital requirements" to secure the TWI COMPANIES' risk to fund the Transaction; and (ii) Plaintiffs did not have an existing multi-year track record and tax filings to support a transaction this size.

77.      ROSE, MRA, CLARK and the TWI COMPANIES verbally communicated to, manipulated, and misled Plaintiffs by using the Insurance Wrap as a means to make the advanced payment for the purchase of an Insurance Wrap appear as a guarantee required for the TWI COMPANIES to fund the Transaction.

78.      In furtherance of their scheme, Defendants intentionally and methodically omitted any reference of the Insurance Wrap from every single engagement agreement, invoice, term sheet or contract presented by Defendants to Plaintiffs throughout the Transaction. Rather, ROSE, MRA, CLARK and the TWI COMPANIES cloaked the false pretenses and collection of the advance fee in their contracts by characterizing it as an "Allocation Fee."

79.      ROSE further stated that the Allocation Fee was not payable directly to the insurance carrier, but rather payable to MRA, who would then remit the funds to the TWI COMPANIES to purchase such Insurance Wrap on behalf of the Plaintiffs.

80.      On November 2, 2019, to continue Defendants' scheme and lull Plaintiffs into a sense of security and safety, ROSE represented on a phone call "that the [Allocation Fee] would be returned to Plaintiffs upon their initial receipt of funds from the Transaction."

81.      Plaintiffs, at the direction of ROSE, and needing to finance the "refundable" TWI COMPANIES' Allocation Fee (i.e., Insurance Wrap), amended and increased the Transaction's capital requirements to $176,000,000.00.

82.      Knowing full well that Defendants never intended to fund the Transaction, ROSE only encouraged the increased Transaction proceeds as a means to collect a greater Advance Fee

from Plaintiffs.

83.     Under instruction from and relying on Defendants, on November 10, 2019, Plaintiffs submitted a revised capital request of $176,000,000.00 to ROSE for the TWI COMPANIES' consideration.

**THE TWI COMPANIES' TERM SHEET AND MRA'S INVOICES**

84.     On November 13, 2019, and in furtherance of their scheme, ROSE delivered a term sheet to Plaintiffs detailing the TWI COMPANIES' offer to make a debt and equity investment of $176,000,000.00 (TWI Term Sheet).

85.     The TWI Term Sheet was personally executed by CLARK on behalf of the TWI COMPANIES and specified certain requirements for funding. However, the TWI Term Sheet intentionally omitted any advance fees payable to the TWI COMPANIES (Allocation Fee or Insurance Wrap Fee).

86.     On November 14, 2019, based upon ROSE's and CLARK's representations, Plaintiffs executed the TWI Term Sheet.

87.     On November 15, 2019, ROSE e-mailed Plaintiffs an invoice for an amount due and owing to ROSE in the amount of $3,534,000.00 (MRA Invoice #1).

88.     MRA Invoice #1 simply stated in its description "Allocation/Facilitation." MRA Invoice #1 described a payment schedule whereby an advance payment of $1,767,000.00 was due on December 6, 2019, and the balance, in an equal amount, was due on January 17, 2020.

89.     The MRA Invoice #1 did not specify any other details, or the Insurance Wrap as described by ROSE on the November 1, 2019, call with Plaintiffs.

90.     Plaintiffs contemplated the financial challenge associated with producing $1,767,000.00 to move forward with MRA and the TWI COMPANIES.

91.     Plaintiffs engaged their contract counsel to assist in further due diligence of Defendants, and Plaintiffs worked toward procuring the payment of the MRA Invoice #1.

92.     On November 19, 2019, Plaintiffs had their first direct contact with CLARK when Stel spoke with CLARK on the telephone. CLARK spent great lengths of time extolling the

greatness of the TWI COMPANIES and its transaction experience.

93.     During this call on November 19, 2019, CLARK represented that:

    a.     CLARK lives and works in Clark County, Nevada;

    b.     the TWI COMPANIES are majority owned by CLARK and his family;

    c.     ROSE is a minority shareholder of the TWI COMPANIES;

    d.     CLARK was willing to speak with Plaintiffs' transaction counsel;

    e.     Plaintiffs were free to speak with HOUGHTON; and

    f.     CLARK would meet in person with Plaintiffs in the next several weeks when he traveled to Victoria, Canada from Clark County, Nevada.[11]

94.     Plaintiffs explained their Transaction to CLARK.  CLARK was informed by Plaintiffs that purchase of the Farmland was essential to the Transaction.  Plaintiffs informed CLARK that SWIFT GP had debt obligations secured by the Farmland and that the initial funding of the Transaction would be dedicated to the retirement of the Farmland's debt.

95.     As a means to mislead Plaintiffs and cause Plaintiffs to rely on CLARK's misrepresentations, CLARK specifically stated that the TWI COMPANIES secured funding commitments from four (4) separate investors for the Transaction since Plaintiffs executed the TWI Term Sheet on November 14, 2019.

96.     CLARK falsely lured Plaintiffs into a sense of security by suggesting that Plaintiffs' law firm, Lindsey MacCarthy, would become the fiduciary on the escrow account and supervise post funding/transfer transactions.

97.     When Plaintiffs questioned CLARK about the Allocation Fee's purpose, CLARK explained that the Allocation Fee would be used to purchase an Insurance Wrap.  CLARK reiterated the same false information that ROSE explained on the Insurance Wrap Call: that an insurance policy was needed to secure the funding from the TWI COMPANIES.  CLARK asserted that "if [Plaintiffs] had an existing multi year track record and tax filings to support the investment there

---

[11] As discussed more thoroughly below, in March 2023, Plaintiffs learned that CLARK was not actually the real CLARK. Plaintiffs believe that the real identity of the person with whom they spoke and met with that represented himself as CLARK was in fact KOCH.

would be no reason for any additional upfront costs."

98.      On November 20, 2019, as a means to layer liability away from CLARK and the TWI COMPANIES, CLARK communicated via e-mail with Plaintiffs' transaction counsel. CLARK stated "that [Plaintiffs] obligation [financial] is to Michael Rose and Associates." CLARK further stated "TW bills MR&A on this file for legal, my time, the Insurance Wrap necessary for this deal as well as the allocation fees for capital designated from my institutional partners." CLARK followed up with "*we never have had a security violation in any jurisdiction.  We were fully investigated and vetted prior to receiving our funds designation and CUSIP/ISIN[12] registrations.*" (emphasis added). Everything CLARK stated was untrue.

**FEE DISCOUNTING SCHEME**

99.      Knowing full well that the Plaintiffs were considering a large financial commitment, CLARK began using a tactic known as "fee discounting"[13] with Plaintiffs.

100.     During the November 19, 2019, phone call, CLARK asserted that he was reducing transaction fees because of "lower capital requirements."  To this end, CLARK did the following:

          a.      he reduced the TWI COMPANIES' administrative fee from one-half percent (0.5%) to thirty basis points (0.3%);

          b.      he promised to achieve reduction of the interest rate on the TWI COMPANIES' funds from seven percent (7%) to six and one-half percent (6.5%); and

          c.      most importantly, he reduced the Allocation Fee from one percent (1%) to fifty basis points (0.5%).

101.     On November 19, 2019, the same day and after Stel had his telephone conversation with CLARK, and to continue a false sense of urgency and pressure on Plaintiffs, ROSE e-mailed Plaintiffs. ROSE stated in his e-mail that "he [ROSE] just got off the phone with CLARK and we

---

[12] CUSIP and ISIN are unique alphanumeric codes that identify a specific security, such as stocks, bonds, and other financial instruments, in the United States/Canada (CUSIP) and globally (ISIN).

[13] Fee discounting occurs when fraudsters initially present high fees or costs for their sham services or products to the mark. Then, the fraudsters "graciously" offer a discount or reduce the fees to make it seem like the mark is benefiting from their generosity. This is done to manipulate the mark into believing that they are receiving a good deal and to create a sense of obligation or trust, ultimately leading the mark to pay the reduced, but still fraudulent, advance fees.

[CLARK and ROSE] agreed to reduce the allocation fee" to one-half percent (0.5%).

102.    Subsequent to November 19, 2019, ROSE, as part of Defendants' conspiracy, and as a means to get Plaintiffs to pay the Allocation Fee, represented to Plaintiffs that he was communicating with an insurance broker to set up the procurement of the Insurance Wrap.  None of these statements were true.

103.    After the November 19, 2019, phone call and e-mail, the TWI COMPANIES never revised the TWI Term Sheet.  Defendants intentionally omitted any description of the Allocation Fee or the Insurance Wrap in the TWI Term Sheet.

104.    On November 28, 2019, ROSE issued a revised invoice to Plaintiffs (MRA Invoice #2).  The MRA Invoice #2 reduced the Allocation Fee to $883,500.00.  Similar to MRA Invoice #1, MRA Invoice #2 did not detail or mention the Insurance Wrap.

## HOUGHTON'S PERSONAL GUARANTY

105.    Obtaining the funds for the $883,500.00 Allocation Fee was a challenging endeavor for Plaintiffs.

106.    At the recommendation of ROSE and CLARK, Plaintiffs communicated concurrently with HOUGHTON during Plaintiffs' engagement with MRA and the TWI COMPANIES.

107.    HOUGHTON represented that he had completed four (4) deals with the TWI COMPANIES totaling over $200,000,000.00 and that he "received the funds from TWI sooner than agreed."

108.    HOUGHTON specifically stated these facts to multiple persons in the Transaction, namely: Boyle and Stel.

109.    ROSE and CLARK each independently promoted HOUGHTON as someone that would verify ROSE, CLARK, and the TWI COMPANIES, as well as their abilities and sense of honest business acumen.

110.    However, HOUGHTON lied.  None of this was true.

111.    Between November 28, 2019, and December 12, 2019, Defendants knew that

Plaintiffs would not proceed with the Transaction unless Plaintiffs either: (i) borrowed the Allocation Fee; or (ii) had some form of security for payment of the Allocation Fee.

112.    Plaintiffs reached out to HOUGHTON to see if HOUGHTON was willing to assist as HOUGHTON had vouched for ROSE, CLARK, and the TWI COMPANIES.

113.    HOUGHTON, as part of Defendants' scheme, agreed to personally guarantee Plaintiffs' $883,500.00 Allocation Fee payment to ROSE, CLARK, and the TWI COMPANIES.

114.    On December 12, 2019, HOUGHTON executed a secured promissory note in the amount of $883,500.00 in favor of Plaintiffs (the Secured Promissory Note) to falsely give Plaintiffs a sense of security for the Transaction with ROSE, CLARK, and the TWI COMPANIES.

115.    After receipt of the Secured Promissory Note, Plaintiffs felt assured that they could trust ROSE, CLARK, and the TWI COMPANIES.

116.    Subsequently, Plaintiffs paid MRA and ROSE the Allocation Fee of $883,500.00 in three (3) installment payments:

        a.    $500,000.00 on December 17, 2019;

        b.    $313,500.00 on December 18, 2019; and

        c.    $70,000.00 on January 6, 2020.

117.    On January 9, 2020, ROSE confirmed receipt of these funds and confirmed that the $883,500.00 Allocation Fee was transferred to the TWI COMPANIES.

118.    On or about January 15, 2020, and after CLARK, ROSE, and the TWI COMPANIES received the Allocation Fee, CLARK represented to Plaintiffs that:

        a.    CLARK received the $883,500.00 from MRA and ROSE;

        b.    CLARK secured a 50/50 co-investment of $88,300,000.00 from each Citadel and Credit Suisse respectively;

        c.    CLARK transferred one-half (½) of the Allocation Fee to Citadel for the insurance wrap as Citadel utilized a self-insurance product for funding;

        d.    CLARK transferred one-half (½) of the Allocation Fee to Willis Towers, the purported broker for an insurance policy with Lloyds of London on behalf of Credit Suisse's

secured investment;

e.    The TWI COMPANIES set funding for February 29, 2020, because the Plaintiffs had "paid the Insurance Wrap in full."

119.    None of the statements turned out to be true or correct.

## DEFENDANTS STRING ALONG PLAINTIFFS

120.    From February 2020, through December 2021, Defendants repeatedly and deliberately provided false information to Plaintiffs about the progress of the Transaction's funding.

121.    Defendants never had any intention of making any investment, loan, or funding.

122.    Further, Defendants never intended to and never purchased an Insurance Wrap as Defendants represented they had done.

123.    On February 12, 2020, CLARK e-mailed Plaintiffs explaining that there were supposed delays from one of the TWI COMPANIES' institutional partners Credit Suisse.

124.    CLARK represented that Bridgewater Associates was now at the table to replace Credit Suisse.

125.    None of these statements turned out to be true or correct, however.

126.    In March of 2020, CLARK falsely stated that he and the TWI COMPANIES received $88,500,000.00 from Citadel and that such funds were sitting in an escrow account with CLARK's legal team.  Plaintiffs requested that CLARK demonstrate that his legal team did in fact have the Citadel funds in the escrow account.  Other than CLARK's continued communications, Plaintiffs never received any confirmation from CLARK's legal team or any representative of Citadel.  Consequently, none of these statements turned out to be true or correct.

127.    In April 2020, to continue Defendants' scheme, CLARK proposed that the TWI COMPANIES make a direct co-investment with Citadel.

128.    CLARK then represented that the TWI COMPANIES initiated a $250,000,000.00 USD bond raise through Redmayne Bentley, a brokerage house out of the United Kingdom (Bond Raise). CLARK falsely claimed that he had completed multiple bond raises.  CLARK promised that the first tranche of the Bond Raise would allow $40,000,000.00 to be allocated to the Plaintiffs'

Transaction. None of the statements turned out to be true or correct.

129. Relying upon CLARK's representations that $40,000,000.00 would be allocated to their Transaction, Plaintiffs engaged legal and accounting services to finalize the structure and to provide cross-border tax advice. Plaintiffs paid approximately $150,000.000 for these service providers in reliance upon CLARK's false representations.

130. After multiple requests by Plaintiffs for the bond offering documents and marketing materials to substantiate CLARK's representations, Plaintiffs received nothing more than false weekly verbal reports from CLARK over a six (6) month period.

131. On May 13, 2020, to continue Defendants' scheme, and to continue his delays in hopes that Plaintiffs would disappear, CLARK falsely represented that the TWI COMPANIES were in the throes of the regulatory process with the British Virgin Island Securities Commission. CLARK concocted a story that he was transitioning the TWI COMPANIES from a "closed end hedge fund" structure to a "family office" structure with Deloitte serving as the new fund administrator to remedy the situation. CLARK represented that the transition and the new fund administrator were needed to give him and the TWI COMPANIES more investment mandate flexibility. None of these statements were true or correct.

132. In August 2020, when the $40,000,000.00 was to be funded to Plaintiffs, CLARK claimed that the TWI COMPANIES experienced a massive redemption of $42,000,000.00 on a European real property portfolio in one of his purported close-ended funds. CLARK further represented that any bond monies raised to date would now be used to meet the redemption obligation, not the Transaction. Following the redemption, the TWI COMPANIES now had $62,000,000.00 in European real property assets to leverage according to CLARK, and he claimed that he engaged Barclays Bank and Wells Fargo for a loan on these assets, whereby the TWI COMPANIES would ultimately fund $40,000,000.00 for the Transaction.

133. On September 14, 2020, TWI issued a $40,000,000.00 term sheet to Plaintiffs with tranche funding dates scheduled for the end of September and the end of October 2020.

134. From September 2020 through January 2021, CLARK's delays were numerous in

both the closing of the loan and the purported Bond Raise.  Plaintiffs requested proof of CLARK's assertions, but CLARK never delivered any documentation to Plaintiffs.

135.    On December 8, 2020, as a means to continue his scheme and demonstrate some proof of legitimacy, CLARK e-mailed Plaintiffs information that approximately $7,200,000.00 was in an escrow account purportedly controlled by CLARK and TWI COMPANIES.  The e-mail sent from CLARK to Plaintiffs was a forwarded e-mail from Karie Wilson, Esq., an attorney associated with the law firm of Alverson, Taylor, and Sanders, in Clark County, Nevada.  In the e-mail, Karie Wilson, Esq. confirmed that $7,199,000.00 was in fact in an escrow account.

136.    On January 6, 2021, the TWI COMPANIES issued a new term sheet.  Nothing materialized.

137.    On March 10, 2021, the TWI COMPANIES again issued another term sheet. CLARK represented that bank wire transfers were initiated but, again, nothing ever materialized.

138.    In May 2021, CLARK announced that Citadel was apparently back at the table for the transaction. CLARK represented that Citadel, and the TWI COMPANIES would merge, and that Citadel would acquire all of the TWI COMPANIES' assets.

139.    CLARK also represented that Citadel was now prepared to fund the entire $176,000,000.00 through a new $3.3 billion agriculture fund.  CLARK stated that the Transaction was to be one of the first projects to be funded by Citadel's agricultural fund.

140.    By August of 2021, Plaintiffs' patience had run out.

141.    Sensing that Plaintiffs were exhausted by the gamesmanship and broken promises, and as a means to continue Defendants' scheme, CLARK met with Langefeld in Victoria, Canada on August 25, 2021.

142.    When CLARK met with Langefeld, CLARK presented and looked to be a male over the age of 65 years.  When CLARK spoke, his voice matched the same voice that the person Langefeld had spoken with since November 2019. CLARK recapped all of his alleged hard work to fund the Transaction and blamed market forces and timing for the delays.

143.    From August 2021, until January 2022, CLARK would share with Plaintiffs made-

up trials and tribulations of trying to complete a merger with Citadel.   CLARK asserted that there were weekly calls with Citadel and personal calls with Ken Griffen, Citadel's CEO.  CLARK told Plaintiffs of multiple trips to Chicago wherein CLARK allegedly fought to get Plaintiffs' funding to the finish line.  None of these statements were true or correct.

144.    In February 2022, to continue Defendants' scheme, CLARK represented to Plaintiffs that, utilizing Canaccord Capital, he would facilitate a Direct Public Offering (DPO) to raise capital for the Transaction with Citadel.   CLARK claimed that the TWI COMPANIES would commit the first $20,000,000.00 from the DPO raise to the Transaction. and

145.    For the next five (5) months, CLARK continued offering more false updates and associated challenges to closing funds from the DPO with no tangible evidence that supported any of CLARK's representations.

146.    For every phone call Plaintiffs had with CLARK, Plaintiffs requested that CLARK produce evidence supporting his assertions. Plaintiffs asked CLARK to introduce Plaintiffs to the persons CLARK claimed to have contact with, or share an e-mail exchange, or for Plaintiffs to participate in CLARK's conference calls with Citadel as a casual listener or share the transaction receipts.  CLARK placated Plaintiffs with a "yes," and that he would "talk to his lawyer about what he's allowed to share" but nothing he said turned out to be true or correct.  In early 2022, Langefeld spoke with Clark.  Langefeld told Clark that Plaintiffs will have choice but to pursue legal process against the Defendants if Clark does not resolve these matters.

**DEFENDANTS USE PLAINTIFFS' MONIES TO PURCHASE NEVADA REAL PROPERTY**

147.    CLARK, in concert with Defendants, and knowing that Plaintiffs would potentially pursue legal process, commenced a "defense strategy" to protect and hide the Allocation Fee that Defendants had unlawfully obtained from Plaintiffs.

148.    On April 26, 2022, and April 28, 2022, unbeknownst to Plaintiffs, CLARK, KOCH, CINDY, and KRYSTAL, acting in concert together and in a manner to hide their ill-gotten gains, used Plaintiffs' Allocation Fee to finance the purchase of two (2) residential homes in Clark County,

Nevada.

149.    On April 26, 2022, CLARK, CINDY, and KRYSTAL, as joint tenants, purchased the property known as 6172 Luna View Avenue in Clark County, Nevada (the Luna Property).

150.    The Luna Property was purchased for $1,157,995.00 USD, of which Defendants used approximately $405,000.00 USD of Plaintiffs' cash and financed the balance with a loan in the amount of $753,000.00 USD.

151.    In the procurement of the Luna Property, KOCH intentionally disclaimed interest in the title to the Luna Property and hence has no legal ownership to the Luna Property under the law.

152.    On April 28, 2022, CINDY, as her sole and separate property, purchased the property known as 6214 Desert Flora Avenue in Clark County, Nevada (the Desert Property).

153.    The Desert Property was purchased for $1,073,710.00 USD, of which Defendants used approximately $378,000.00 USD of Plaintiffs' cash and financed the balance with a loan in the amount of $696,000.00 USD.

154.    In the procurement of the Desert Property, KOCH intentionally disclaimed interest in the title to the Desert Property and hence has no legal ownership to the Desert Property under the law.

155.    On June 23, 2022, Plaintiffs, by and through their attorneys, sent a legal notice to ROSE and MRA, demanding the return of the $883,500.00 Allocation Fee.

156.    After receipt of the demand notice, ROSE spoke with Langefeld and Stel.

157.    ROSE stated that ROSE and MRA were not the parties responsible for the return of the Allocation Fee as it was given to CLARK and the TWI COMPANIES.

158.    After ROSE's receipt of the demand notice, Stel spoke with HOUGHTON to discuss his personal guaranteed obligation for the Advance Payment.

159.    HOUGHTON refused to honor his personal guarantee under the Secured Promissory Note, and HOUGHTON asserted that he was impervious to liability, contending that he has no assets in his name.

160.    Langefeld has maintained open communications with CLARK in a continued

attempt to recover the Allocation Fee.

161.     In late February 2023, CLARK stated to Langefeld that the TWI COMPANIES had acquired real property holdings in the State of Nevada.

### PLAINTIFFS HIRE A PRIVATE INVESTIGATOR AND UNEARTH DEFENDANTS' FRAUDULENT IDENTITIES AND FRAUDULENT CONVEYANCES OF REAL PROPERTY

162.     In March 2023, because Plaintiffs never received any funding, the Farmland was foreclosed on rendering the Transaction terminated.  Together with the $883,500.00 Allocation Fee and the foreclosure of the Farmland, Plaintiffs lost $12,500,000.00, as well as other related damages due to Defendants' web of lies and delays.

163.     On March 14, 2023, Langefeld informed CLARK that the Transaction was now terminated.  Langefeld requested CLARK unwind the Insurance Wrap that CLARK purchased on Plaintiffs' behalf with Plaintiffs' Allocation Fee.  CLARK responded that these monies were never paid to Citadel or Willis Tower.  CLARK admitted to Langefeld that the $883,500.00 had been consumed by the TWI COMPANIES' overhead demands.

164.     In March 2023, having been strung along with broken and fraudulent promises, and outright theft of Plaintiffs' monies, Plaintiffs engaged a private investigator in the State of Nevada (Investigator) to track down CLARK and the TWI COMPANIES to glean more information about them.

165.     The Investigator revealed that CLARK was a 40-year-old male living in Clark County, Nevada.  The investigation and Plaintiffs' diligence revealed that Facebook photos confirmed the person with whom Langefeld met was not CLARK but rather KOCH.  Langefeld, Stel, and the Plaintiffs had communicated with KOCH for over two (2) years, when the entire time KOCH pretended to be CLARK.

166.     Upon information and belief, KOCH, with the knowledge and assistance of CLARK, ROSE, CINDY, KRYSTAL, and HOUGHTON, has unlawfully impersonated CLARK as a means to conceal KOCH's Canadian convictions and operate Defendants' scheme to defraud Plaintiffs.

167.    MRA's current website, as of the date of this Complaint, is a complete roadmap of Defendants' scheme:



168.    The MRA website uses the TWI COMPANIES as the central operator with alleged relationships with ubiquitous financial concerns: Citadel, Lloyd's, Deloitte, Bridgewater, and Ogier. All are false and are all the same financial companies that KOCH used while impersonating CLARK.

169.    Upon information and belief, ROSE as the owner of MRA, conspired with KOCH, CLARK, and HOUGHTON to run Defendants' scheme.

170.    In March 2023, Plaintiffs learned that Defendants had executed their advance fee scheme on Copperblock Inglewood Intersection, Inc.[14]

171.    After Plaintiffs learned that Defendants were in fact operating a criminal enterprise, Langefeld met again with KOCH in Clark County, Nevada on August 8, 2023.  During their

---

[14] On December 13, 2019, CLARK, KOCH, ROSE, TWI COMPANIES and MRA executed the same scheme against Copperblock Inglewood Investments, Inc. (Copperblock). Defendants made false promises to Copperblock, whereby Copperblock advanced $40,000.00 to MRA and TWI COMPANIES, and Copperblock has not received the return of its money or fulfillment of promises made by Defendants.

meeting, KOCH continued to represent himself as CLARK. Langefeld did not disclose that he knew that KOCH was not in fact CLARK. For two (2) hours, KOCH continued to pontificate about his misrepresentations, excuses, and failed strategy. KOCH claimed that he was still working on purported deals with Bridgewater to accomplish funding the Transaction.

172.    On September 9, 2023, as a means to continue their criminal enterprise, KOCH, impersonating CLARK, called and spoke with Langefeld. KOCH exhaustively asserted multiple plans to repay Plaintiffs.

173.    To date, Defendants have failed to and have refused to return the Allocation Fee to Plaintiffs.

174.    Upon information and belief, Defendants acted in concert with the intention of accomplishing their unlawful advance payment scheme for the purpose of harming Plaintiffs.

175.    Plaintiffs actually, reasonably, and detrimentally relied on ROSE, CLARK, HOUGHTON and KOCH's false representations and promises to trust Defendants.

176.    Defendants promised Plaintiffs that payment of the Allocation Fee was a condition to the TWI COMPANIES funding the Transaction. This was all false.

177.    Defendants relied upon KOCH, CLARK, HOUGHTON, and ROSE's representations that Plaintiffs' payment of $883,500.00 would be used to purchase an Insurance Wrap with Lloyds of London through Willis Tower. This was false. Rather, the TWI COMPANIES, CLARK, KOCH, MRA, and ROSE, acting in a position of trust, misrepresented the use of Plaintiffs' monies by misappropriating Plaintiffs' monies for their personal benefit. Defendants intentionally and knowingly utilized the Insurance Wrap tactic to induce Plaintiffs to enter into the MRA Engagement, TWI Term Sheet, and Secured Promissory Note to fraudulently facilitate the Allocation Fee to Defendants.

178.    Plaintiffs actually, reasonably, and detrimentally relied on the false stated historic transactions claimed by ROSE, CLARK, KOCH, and HOUGHTON when deciding to make the Allocation Fee to Defendants.

179.    Defendants knew, or should have known, that Plaintiffs would detrimentally rely on

the false stated historic transactions in deciding to pay the Allocation Fee to the Defendants.

180.    Defendants, individually and through their representatives, provided false stated historic transactions with the wrongful intention of concealing their scheme to defraud Plaintiffs as a means to exploit Plaintiffs and induce Plaintiffs to make the Allocation Fee to Defendants under completely false pretenses.

181.    As a result of the Defendants' malfeasance and intentional, malicious conduct, the Plaintiffs were forced to hire attorneys to prosecute their claims herein.

## FIRST CLAIM FOR RELIEF

### (Fraudulent or Intentional Misrepresentation as to all Defendants)

182.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

183.    Defendants made the false representations as set forth in Paragraphs 48-181 above.

184.    When Defendants made these false representations on behalf of Defendants, they knew them to be false, or had an insufficient basis of information for making them, and they made these representations with the intention to deceive and defraud Plaintiffs and induce Plaintiffs to act in reliance on these representations in the manner hereinafter, or with the expectation that Plaintiffs would so act.

185.    Defendants' false representations were made with the intent to fleece Plaintiffs out of at least $883,500.00 wherein Defendants fraudulently and intentionally misrepresented facts to persuade Plaintiffs into paying the Evaluation Fee and Allocation Fee.

186.    Further, Defendants fraudulently and intentionally misrepresented facts in order to induce Plaintiffs into entering the MRA Engagement, MRA LOI, TWI Term Sheet, and Secured Promissory Note.

187.    Plaintiffs, at the time these representations were made and at the time Plaintiffs took the actions herein alleged, were ignorant of the falsity of Defendants' representations and believed them to be true.

188.    In reliance on these representations, Plaintiffs were induced to, and did, take all of

the actions heretofore described.

189.    Had Plaintiffs known the actual facts, they would not have taken such actions, to include entering into the MRA Engagement, MRA LOI, TWI Term Sheet, and Secured Promissory Note and would not have paid either the Evaluation Fee or the Allocation Fee.

190.    Plaintiffs' reliance on Defendants' representations was justified.

191.    By making these fraudulent and intentional misrepresentations, Defendants caused damages to Plaintiffs, and Plaintiffs' reliance on the truth of the representations by Defendants were a proximate result and substantial factor in causing the harm to Plaintiffs.

192.    Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' fraudulent or intentional misrepresentations.

193.    As a direct and proximate result of Defendants' fraudulent or intentional misrepresentations, Plaintiffs have incurred damages, all in addition to the other damages as set forth herein, in an amount to be determined at the time of trial, but in excess of $75,000.

## SECOND CLAIM FOR RELIEF

### (Negligent Misrepresentation as to all Defendants)

194.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

195.    Defendants, in the course of an action in which they had a pecuniary interest, failed to exercise reasonable care or competence in obtaining or communicating information to Plaintiffs.

196.    Defendants misrepresented to Plaintiffs that the Defendants would use the $883,500.00 Allocation Fee to purchase an Insurance Wrap for the benefit of Plaintiffs.

197.    Plaintiffs justifiably relied on Defendants' representations as presented and made by Defendants.

198.    Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' negligent misrepresentations.

199.    As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of

$75,000.

## THIRD CLAIM FOR RELIEF

### (Constructive Fraud as to all Defendants)

200.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

201.    Constructive fraud is characterized by a breach of duty arising out of a fiduciary or confidential relationship.

202.    A "confidential or fiduciary relationship" exists when one reposes a special confidence in another so that the latter, in equity and good conscience, is bound to act in good faith and with due regard to the interests of the one reposing the confidence.

203.    In the instant case, Defendants held a confidential and fiduciary relationship with Plaintiffs. Specifically, Plaintiffs contracted with Defendants for Defendants to fund the Transaction as referenced in the MRA Engagement, MRA LOI, TWI Term Sheet and Secured Promissory Note. Plaintiffs entrusted Defendants to use Plaintiffs' monies to purchase the Insurance Wrap. Accordingly, Defendants owed a legal or equitable duty to Plaintiffs arising from this fiduciary or confidential relationship.

204.    By way of their actions, Defendants breached their legal and equitable duty to Plaintiffs by fraudulently deceiving Plaintiffs in direct violation of Plaintiffs' confidence, as well as misrepresenting and concealing material facts from Plaintiffs as alleged herein.

205.    Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' constructive fraud.

206.    As a direct and proximate result of Defendants' constructive fraud, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

## FOURTH CLAIM FOR RELIEF

### (Conversion as to Defendants ROSE, CLARK, KOCH, MRA, and TWI)

207.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

208.    When Defendants fraudulently induced Plaintiffs into remitting the Allocation Fee to Defendants with no intent to perform on the promises made by Defendants to Plaintiffs and caused for the funds remitted by Plaintiffs to be used for Defendants' sole benefit, Defendants engaged in the tort of conversation.  That is, the act of wrongful dominion and control over the personal property of Plaintiffs in denial of or inconsistent with the title or rights of Plaintiffs.

209.    Defendants' conversion was in denial of, or inconsistent with, Plaintiffs' title or rights therein.

210.    Further, Defendants' conversation is in derogation, exclusion, or defiance of Plaintiffs' title or rights.

211.    The true title and rights of Plaintiffs' personal property was given to Defendants for Defendants to make monetary investments in the Transaction for the benefit of Plaintiffs.

212.    However, Defendants have converted Plaintiffs' monetary personal property by improperly and wrongfully using the Allocation Fee and refusing to fund the Transaction as represented to Plaintiffs.

213.    Defendants' conversion was intentional and deliberate and did cause the direct loss suffered by Plaintiffs in excess of $75,000.

214.    As a direct and proximate result of Defendants' conversion, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

215.    Plaintiffs have no other adequate remedy at law except a money judgment against Defendants, jointly and severally, in the amount fraudulently taken from Plaintiffs.

### FIFTH CLAIM FOR RELIEF

### (Breach of Contract as to the TWI COMPANIES and MRA)

216.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

217.    Plaintiffs entered into several valid and existing contracts with Defendants, particularly the MRA Engagement, MRA LOI, and TWI Term Sheet.

218.    Plaintiffs duly performed all terms, conditions, and covenants required under the MRA Engagement, MRA LOI, and TWI Term Sheet, except those terms, conditions, and/or

covenants the performance of which were waived, excused, or prevented by Defendants.

219.    Defendants failed to perform when they:

a.    breached the MRA Engagement, MRA LOI, and TWI Term Sheet by failing to follow through on Defendants' promises and representations as misrepresented to Plaintiffs as alleged herein in paragraphs 48-181.

b.    breached the MRA Engagement, MRA LOI, and TWI Term Sheet by failing to use the Allocation Fee as promised and refusing to fund the Transaction as represented to Plaintiffs;

c.    breached the MRA Engagement, MRA LOI, and TWI Term Sheet by improperly and wrongfully utilizing the funds to purchase Nevada real property for the Defendants' sole benefit; and

d.    breached the MRA Engagement, MRA LOI, and TWI Term Sheet by inducing Plaintiffs to remit the Allocation Fee.

220.    Defendants were not excused from performance.

221.    Plaintiffs have been detrimentally harmed and damaged as a result of the TWI COMPANIES' and MRA's breaches.

222.    As a direct and proximate result of the TWI COMPANIES' and MRA's breaches, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

## SIXTH CLAIM FOR RELIEF

### (Breach of Contract as to HOUGHTON)

223.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

224.    Plaintiffs entered into a Secured Promissory Note with HOUGHTON.

225.    Plaintiffs duly performed all terms, conditions, covenants required under the written agreements, except those terms, conditions, and/or covenants the performance of which were waived, excused, or prevented by HOUGHTON.

226.    HOUGHTON breached the Agreements by refusing to honor his obligations under the Secured Promissory Note.

227.    HOUGHTON failed to perform and was not excused from performance.

228.    Plaintiffs have been detrimentally harmed and damaged as a result of HOUGHTON's breaches.

229.    Plaintiffs seek specific performance and a Court order compelling HOUGHTON to comply with the Secured Promissory Note. Alternatively, as a direct and proximate result of HOUGHTON's breaches, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

230.    Plaintiffs have been forced to retain an attorney and incur attorneys' fees and costs as a result of HOUGHTON's breaches and are entitled to reasonable attorneys' fees and costs.

## SEVENTH CLAIM FOR RELIEF

### (Breach of Implied Covenant of Good Faith and Fair Dealing as
### to the TWI COMPANIES & MRA)

231.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

232.    Plaintiffs and Defendants were parties to several valid and existing contracts, particularly the MRA Engagement, MRA LOI, and TWI Term Sheet.

233.    Every contract entered into under the law contains an implied covenant of good faith and fair dealing.

234.    Thus, the TWI COMPANIES and MRA owed duties of good faith and fair dealing to Plaintiffs in performing on the MRA Engagement, MRA LOI, and TWI Term Sheet.

235.    The TWI COMPANIES and MRA have breached the implied covenant of good faith and fair dealing by, among other things, breaching the MRA Engagement, MRA LOI, and TWI Term Sheet by (i) failing to use the Allocation Fee as promised, (ii) refusing to fund the Transaction as represented to Plaintiffs, (iii) converting Plaintiffs' monetary personal property and (iv) improperly and wrongfully utilizing the funds to purchase Nevada real property for Defendants'

sole benefit by inducing Plaintiffs to remit the Evaluation Fee, Placement Fee, Facilitation Fee, and Allocation Fee.

236.    Plaintiffs' justified expectations were thus denied.

237.    Plaintiffs have been detrimentally harmed and damaged as a result of the TWI COMPANIES' and MRA's breaches.

238.    As a direct and proximate result of the TWI COMPANIES' and MRA's breaches, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

## EIGHTH CLAIM FOR RELIEF

### (Breach of Fiduciary Duty as to the TWI COMPANIES & MRA)

239.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

240.    At all relevant times, by and reason of their trusted position and their professed skill, the TWI COMPANIES and MRA directly owed Plaintiffs fiduciary obligations, which include the obligations of good faith, trust, loyalty, and due care.

241.    The TWI COMPANIES and MRA expressly informed Plaintiffs that Plaintiffs could trust Defendants, in particular the TWI COMPANIES and MRA, to use Plaintiffs' monies to purchase an Insurance Wrap on behalf of Plaintiffs so that Plaintiffs would receive funding from the Defendants.

242.    TWI and MRA were required to use their utmost ability to protect and use Plaintiffs' monies in a fair, just, honest, and equitable manner as they promised to do.

243.    The TWI COMPANIES and MRA breached their fiduciary duties by, among other things, breaching the MRA Engagement, MRA LOI, and TWI Term Sheet by (i) failing to purchase an Insurance Wrap; (ii) refusing to fund the Transaction as represented to Plaintiffs; (iii) converting Plaintiffs' monetary personal property improperly; and (iv) wrongfully utilizing the funds to purchase Nevada real property for Defendants' sole benefit, by inducing Plaintiffs to remit the Evaluation Fee, Placement Fee, Facilitation Fee, and Allocation Fee.

244. The TWI COMPANIES and MRA's conduct was not, and could not have been, an exercise of good faith business judgment.

245. Plaintiffs have been detrimentally harmed and damaged as a result of the TWI COMPANIES and MRA's breaches.

246. As a direct and proximate result of the TWI COMPANIES and MRA's breaches, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

## NINTH CLAIM FOR RELIEF

### (Civil Conspiracy as to all Defendants)

247. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

248. Defendants, by acting in concert, intended to accomplish an unlawful objective for the purpose of harming Plaintiffs.

249. Namely, Defendants, acting and in concert, fraudulently induced Plaintiffs into advancing monies with no intention of using the monies as Defendants' fraudulently, intentionally, and negligently misrepresented to Plaintiffs. To accomplish this, Defendants fraudulently misrepresented their intent, historic investment ventures, and failed to provide any supporting evidence to support their Advance Payment Scheme.

250. When Defendants unilaterally failed to follow through with their promises and representations, Defendants committed the tort of civil conspiracy. That is, the agreement between two or more persons to accomplish an unlawful purpose or to accomplish a lawful objective by unlawful means causing damages.

251. The acts of Defendants, each acting out of self-interest, were intentional and deliberate and did cause the direct loss in excess of $75,000 by Plaintiffs.

252. Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' civil conspiracy.

253. As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have

incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

### TENTH CLAIM FOR RELIEF

### (Civil Aiding and Abetting as to all Defendants)

254.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

255.    One who counsels, advises, abets or assists the commission of an actionable wrong by another is responsible to the injured person for the entire loss or damage.

256.    Defendants, by acting in concert, intended to accomplish an unlawful objective for the purpose of harming Plaintiffs.

257.    At all relevant times herein, Defendants knew and were aware of their roles in promoting the breach of duty they owed to Plaintiffs at the time they provided assistance and encouragement to one another to induce Plaintiffs into advancing monies to Defendants.

258.    Namely, Defendants, acting in concert, substantially assisted and encouraged the other Defendants to fraudulently induce Plaintiffs into advancing monies with no intention of using the monies for the Transaction as Defendants' fraudulently, intentionally, and negligently represented the facts to Plaintiffs.

259.    Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' aiding and abetting.

260.    As a direct and proximate result of Defendants' aiding and abetting, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

### ELEVENTH CLAIM FOR RELIEF

### (Alter Ego as to All Defendants)

261.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

262.    Upon information and belief, the TWI COMPANIES and MRA are mere shells and alter egos of CLARK, KOCH, and ROSE.

263.    The TWI COMPANIES and MRA were influenced and governed by CLARK,

KOCH, KRYSTAL, CINDY, ROSE, and HOUGHTON to be their alter ego.

264. Upon information and belief, Defendants have failed to observe the requisite limited liability company formalities by: (a) failing to maintain and treat the TWI COMPANIES and MRA as separate and distinct entities from themselves and other entities; (b) failing to segregate the TWI COMPANIES' and MRA's assets from Defendants' respective assets; (c) treating the TWI COMPANIES' and MRA's assets as if they were Defendants' private assets; (d) concealing and diverting assets to the detriment of investors; (e) failing to properly manage the TWI COMPANIES and MRA's finances; (f) failing to disclose all relevant information to Plaintiffs; (g) concealing corporate records from Plaintiffs; and (h) failing to honor Plaintiffs' rights.

265. Defendants interchangeably used the TWI COMPANIES' and MRA's names for different documents and purposes without clarification to Plaintiffs. Then, when an issue arose, Defendants would point blame at another Defendant even though the Defendant entities wholly controlled each other.

266. There was such unity of interest and ownership of the TWI COMPANIES and MRA that the Defendants are inseparable from the TWI COMPANIES and MRA.

267. As a result of the commingling of funds and assets, unauthorized diversion of funds, treatment of corporate assets as the individual's own, failure to observe corporate formalities, mishandling, diversion, and concealment of assets by Defendants, Defendants are now unable to return Plaintiffs' monies.

268. Under such circumstances, Plaintiffs should be entitled to ignore the liability protection normally afforded to officers, directors, and separate companies, and instead pursue collection jointly and severally against all Defendants.

269. As described herein, Defendants' conduct constitutes a fraud and promotes injustice.

270. Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' conduct.

271. As a direct and proximate result of Defendants' conduct, Plaintiffs have incurred damages as set forth herein, in an amount to be determined at the time of trial, but in excess of

$75,000.

## TWELFTH CLAIM FOR RELIEF

### (Unjust Enrichment as to all Defendants)

272.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

273.    Defendants have unjustly retained Plaintiffs' monies against fundamental principles of justice, equity, and good conscience, specifically by wrongfully inputting Plaintiffs' monies for personal gain and purchasing Nevada real property for the sole benefit of Defendants.

274.    As such, Defendants have been unjustly enriched.

275.    As a direct and proximate result of Defendants' unjust enrichment, Plaintiffs have incurred damages in an amount to be determined at the time of trial, but in excess of $75,000.

## THIRTEENTH CLAIM FOR RELIEF

### (Constructive Trust as to all Defendants)

276.    Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

277.    A confidential relationship exists between the parties.

278.    Through fraud, mistake, and/or other wrongful act, Defendants used Plaintiffs' monies to acquire personal and Nevada real property with monetary personal property that lawfully belonged to Plaintiffs.

279.    Defendants have taken, presently possess, and have wrongfully gained Plaintiffs' property, including but not limited to the Evaluation Fee, Placement Fee, Facilitation Fee, and Allocation Fee in an amount that exceeds $75,000.00.

280.    Plaintiffs are the rightful owners of the $883,500.00.

281.    A constructive trust exists whereby Defendants presently holds legal title to the personal property and Nevada real property wrongfully purchased with Plaintiffs' monies, which Defendants should hold title as trustee for the benefit of Plaintiffs.

282.    The retention of legal title by Defendants thereof against the Plaintiffs is inequitable.

283.   The existence of such a trust is essential to the effectuation of justice.

## FOURTEENTH CLAIM FOR RELIEF

### (Injunctive Relief as to All Defendants)

284.   Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth at length herein.

285.   This lawsuit presents an actual case in controversy between the parties regarding more than $75,000.00 fraudulently taken from Plaintiffs.

286.   Federal Rules of Civil Procedure, Rule 65 permits a federal court to grant a preliminary injunction upon a showing by the movant of substantial likelihood of success on the merits, that the movant will suffer irreparable injury without the injunction, that the injunction will not substantially injure others, and that the injunction furthers the public interest.

287.   Defendants had no right, contractual or otherwise, to defraud the Plaintiffs out of excess of $75,000.00.  This was simply a brazen act of fraud executed under the guise of an investment scheme.  Defendants, with the assistance of others, were able to enrich themselves through a pattern of fraudulent and deceitful actions as set forth in this Complaint.

288.   Plaintiffs have been detrimentally harmed and damaged as a result of Defendants' conduct.

289.   Plaintiffs request a preliminary injunction be entered freezing Defendants' assets given the facts and manner in which Defendants fraudulently fleeced monies from Plaintiffs through stealth and deception.  There is a significant likelihood of success on the merits.  If a preliminary injunction is not granted, Plaintiffs will suffer irreparable harm.  The granting of an injunction will not harm any other parties.  In light of the foregoing, the Court should grant a preliminary injunction freezing Defendants' assets due to the ongoing unlawful conduct of Defendants, as well as the likelihood of dissipating assets.

WHEREFORE, Plaintiffs pray for relief from this Court as follows:

1.      For a constructive trust;

2.      For injunctive relief freezing certain of the Defendants' assets;

1    3.    For damages in an amount in excess of $75,000 jointly and severally against all

2    Defendants;

3    4.    For specific performance and a Court order compelling HOUGHTON to comply

4    with the Secured Promissory Note;

5    5.    For attorneys' fees and costs as recoverable as incurred in this action against

6    HOUGHTON;

7    6.    For prejudgment interest on all sums found to be due and owing; and

8    7.    For such other and further relief as the Court may deem just and proper.

9        DATED: October 30, 2023.

10                                                FLYNN GIUDICI, PLLC

11                                    By:    _____

12                                                SHAMUS FLYNN (SBN 14870)
                                                  Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28